**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMPETITIVE ENTERPRISE INSTITUTE<br>1001 Connecticut Avenue, N.W.<br>Suite 1250<br>Washington, D.C. 20036<br><br>Plaintiff,<br><br>vs.<br><br>GEORGE WALKER BUSH<br>As Chairman,<br>National Science and Technology Council<br>Old Executive (Eisenhower) Office Building<br>17th Street and Pennsylvania Avenue, N.W.<br>Washington, DC 20502<br><br>JOHN MARBURGER<br>Director,<br>White House Office of Science<br>and Technology Policy<br>Old Executive (Eisenhower) Office Building<br>17th Street and Pennsylvania Avenue, N.W.<br>Washington, D.C. 20502<br><br>Defendants. | C.A. No. 03-01670 (RJL) |

**AMENDED COMPLAINT FOR DECLARATORY RELIEF**

1. This is an action under the Federal Data Quality Act (FDQA)(enacted as Section 515(a) of the Fiscal Year 2001 Treasury and General Government Appropriations Act for Fiscal Year 2001 (Public Law 106-554)) and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, seeking to apply both Acts and Defendants' Guidelines under the former to the "National Assessment on Climate Change", by which Defendants impermissibly disseminate demonstrably inaccurate data. In addition or alternately, this action seeks to have the document

declared in violation of the authority under which it was produced, the United States Global Change Research Act of 1990 (USGCRA)(15 U.S.C. 2921 *et seq.*).

Plaintiff Competitive Enterprise Institute (CEI) alleges:

**Parties**

2. Plaintiff CEI is a public policy institute dedicated in significant portion to educating the public on the science, economics and policies surrounding the theory of catastrophic anthropogenic "global warming." Plaintiff was lead plaintiff in litigation also before this Court against the National Assessment, *CEI et al. v. Clinton (Bush)* (CV 00-02383), which Plaintiff withdrew without prejudice upon Defendants asserting that the underlying information and document now at issue in the instant matter were "not policy positions or official statements of the U.S. government". Plaintiff also was one of only two parties to submit comments during development of Defendant OSTP's "Data Quality Act Guidelines" which are relevant to the instant matter, and a petitioner pursuant to those Guidelines for correction of the data at issue in this matter pursuant to the Federal Data Quality Act. Plaintiff resides and is incorporated as a non-profit corporation in the District of Columbia.
3. Plaintiff is thereby an "affected person" under the Federal Data Quality Act, as defined by the Office of Management and Budget's Final Guidelines.
4. Defendant George Walker Bush is a citizen of the State of Texas residing in Washington, D.C., who as President of the United States serves as Chairman of the National Science and Technology Council ("Council", or "NSTC")(Executive Order 12881, November 23, 1993), has responsibility and authority for the

functions of a Federal Coordinating Council on Science, Engineering and Technology (Reorg. Plan No. 1 of 1977, and Executive Order 12039) and thereby is responsible for the document at issue in this Complaint as follows.

a. NSTC, operating under and as a component of the White House Office of Science and Technology Policy ("OSTP") has authority for the Federal Coordinating Council on Science, Engineering and Technology pursuant to Executive Order 12881, and thereby, by statute, the Committee on Environment and Natural Resources ("Committee")(15 U.S.C. 2932).

b. Collectively and pursuant to the statutory prescription of the United States Global Change Research Act, these Executive offices -- "the Council, through the Committee" -- were specifically charged with authority and responsibility through a U.S. Global Change Research Program (USGCRP) to "prepare and submit to the President and the Congress… an assessment which (1) integrates, evaluates and interprets the findings of the [United State Global Change Research Program] and discusses the uncertainties associated with such findings." 15 U.S.C. 2936

c. Responsibility for the Council rests with the President pursuant to Reorg. Plan No. 1 of 1977, and Executive Order 12039. The Committee charged with producing this Assessment on behalf of the Council, and President, is statutorily comprised exclusively of specified federal governmental entities, and "such other [high

ranking officials of] agencies and departments of the United States as the President or the Chairman of the Council considers appropriate," and not any non-governmental entity or outside third party. 15 U.S.C. 2932

5. Defendant Marburger serves as Director of the White House Office of Science and Technology Policy ("OSTP"), which has under its authority the same National Science and Technology Council, which oversees the same Committee on Environment and Natural Resources. Marburger also chairs the Federal Coordinating Council for Science, Engineering and Technology pursuant to Executive Order 12039. Collectively and pursuant to statutory authority, under his leadership these Executive offices have combined to implement the Global Change Research Act of 1990 ("GCRA")(15 U.S.C. 2921 *et seq.*), for the purpose of producing and disseminating a National Assessment on Climate Change ("NACC") and thereby Defendant Marburger is responsible for the document at issue in this Complaint as follows.

    a. The Director of OSTP administers the NSTC and its Committee and therefore OSTP holds immediate responsibility for the distribution of documents resulting from the USGCRP. As such OSTP is the responsible agency under the Federal Data Quality Act relative to the dissemination of the "National Assessment" on Climate Change, also pursuant to Reorg. Plan No. 1 of 1977 and Section 5 of Executive Order No. 12039.

b. OSTP thereby maintains ultimate and exclusive statutory authority and responsibility for such "National Assessment on Climate Change."

**Jurisdiction and Venue**

6. Paragraphs 1 through 5 are incorporated herein.
7. This Court has both subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. §§ 701-706, and under 28 U.S.C. 1331, because Plaintiff asserts claims arising under the laws of the United States.
8. Venue is proper in this district pursuant to the provisions of 28 U.S.C. 1391(e)(3) as this is a civil action in which the Defendant is an agency or employee of the United States acting in its official capacity, Plaintiff resides in the district and no real property is involved. Venue also lies in this district under 5 U.S.C. § 702.

**Statement of the Facts**

9. Paragraphs 1 through 8 are incorporated herein.
10. Beginning January 1998 OSTP began production of the National Assessment on Climate Change.
11. Three months after OSTP initiated production of the National Assessment and to develop assistance toward completing the statutory mandate, in April 1998 a "National Assessment Synthesis Team" ("NAST") first met, to contribute advice toward and one component of Defendants' National Assessment, a "Synthesis Report".
12. In November 2000, OSTP released a document as the National Assessment prescribed by the USGCRA of 1990, "***Climate Change Impacts on the United***

***States: The Potential Consequences of Climate Variability and Change***", and transmitted it to the President and Congress purporting to satisfy OSTP's specifically delegated authority and responsibility to "prepare and submit to the President and Congress" such an Assessment.

13. The statutory authority to produce the National Assessment requires:

"On a periodic basis (not less frequently than every 4 years), the Council, through the Committee, shall prepare and submit to the President and the Congress an assessment which –

(1) integrates, evaluates, and interprets the findings of the [USGCR] Program and discusses the scientific uncertainties associated with such findings;

(2) analyzes the effects of global change on the natural environment, agriculture, energy production and use, land and water resources, transportation, human health and welfare, human social systems, and biological diversity; and

(3) analyzes current trends in global change both human-inducted (sic) and natural, and projects major trends for the subsequent 25 to 100 years." (15 U.S.C. 2936).

14. This Assessment is intended by statute to serve as an influential policy guidance document.

15. Authority and responsibility for producing a National Assessment on Climate Change are assigned by statute and Executive Order to OSTP (USGCRA of 1990 (15 U.S.C. 2921 *et seq.*), Reorg. Plan No. 1 of 1977, and Executive Order 12039).

16. Defendants currently disseminate this document through their USGCRP, upon order in hard copy and electronically at www.USGCRP.gov.

17. By the Federal Data Quality Act Congress directed the White House Office of Management and Budget (OMB) to issue, by 30 September 2001, government-wide guidelines that "provide policy and procedural guidance to Federal agencies for ensuring and maximizing the quality, objectivity, utility, and integrity of information (including statistical information) disseminated by Federal agencies."

18. Pursuant to this charge OMB promulgated "government-wide" Interim Final Guidelines for agency compliance with FDQA requirements (66 FR 49718), finalized by OMB's 3 January 2002 Final Guidance (67 FR 369).

19. These guidelines establish binding parameters for covered offices in producing their own implementing guidelines and thereby control, such that other offices' guidelines must be consistent with OMB's. See *e.g.*, OSTP's FDQA Guidelines, Background, I(4), Administrative Corrections Mechanism IIIA(1).

20. Pursuant to the FDQA, information disseminated by offices of the federal government of the United States must meet particular standards for, *inter alia*, "objectivity" and "utility". 67 FR 370

21. This covers information currently disseminated regardless of whether the information was produced prior to enactment of FDQA.

22. The White House Office of Science and Technology Policy is a covered office under FDQA, and the appropriate office responsible for these purposes for the document at issue in this matter, the "National Assessment".

23. This FDQA framework and the USGCRA of 1990 calling for such an Assessment neither allocate nor permit transfer of authority or responsibility, for production of any document purporting to be that "Assessment" described in and funded pursuant to the USGCRA, to a governmental or non-governmental third party outside of the Council, Committee and President, that is, NSTC and OSTP.

24. This Assessment disseminates a representation of data that has been altered from its peer reviewed form to in effect erase from the historical record acceptance of two critical and widely demonstrated climatic periods.

25. This alteration provides the false appearance of aberrant 20th Century climate.

26. The Assessment also disseminates projections and other assertions largely relying upon this misrepresentation as "information".

27. Specifically, the underlying data for Defendants' representation of the past millennium's climate is a partial recreation that was required by the peer review process to include very large error bands, because of questions over the reliability of the proxies employed to develop the data.

28. These error bands also are necessary, *e.g.*, to accommodate the established cold period ending around 1900, called the "Little Ice Age," an equivalent warm era, the "Medieval Warm Period" peaking around 900 years ago, and are requisite to any accurate representation of the data.

29. Defendants, however, redacted or otherwise excluded these error bands when disseminating the data thereby presenting an unsupportable and inaccurate portrayal of data portraying a recreation of past climate (*e.g.*, Assessment pages 22, 544 Tables "c", and related discussions).

30. This altered data also serves as the basis for Defendant's assumptions of this critical climatic period in assessing overall past, present and future global climate.

31. Most among the thousands of refereed scientific papers extant on the past millennium's climate find evidence for these periods.

32. Knowledge of the existence of these periods is so common that a month rarely passes without yet another study finding local evidence (pollen deposits, corals or tree rings) for either or both periods, yet Defendants' Assessment erases them from the historical record.

33. The Assessment also disseminates and is largely based upon data produced by two computer models hypothesizing future climate change, on the basis of those models' design and the assumptions the modelers incorporate. These models' projections are reiterated and relied upon throughout the document.

34. These two models selected by Defendants to serve as a principal basis for their Assessment are established "outliers" in the field of general circulation models (GCMs), in that they are extreme in their projections of the dominant climate determinants temperature and precipitation, respectively.

35. Each of these two models selected also attest to the reliability of the other, *e.g.*, in directly opposite predictions or scenarios for precipitation in nine of the eighteen regions they project. For example, North Dakota would turn either into a swamp or into a desert, depending on which model one accepts.

36. Defendants, through National Assessment Synthesis Team (NAST) co-chair Thomas Karl, were informed prior to publishing the National Assessment that the models used to produce the data at issue in this matter were incapable of

simulating ten-year averaged temperature changes (1991-2000, 1990-1999, 1989-1998, *etc*…back to 1900-1909 -- the time when humans began to subtly change the composition of the earth's atmosphere) over the United States.

37. This test to validate Defendants' chosen models in fact demonstrated that they performed no better at predicting climate than a table of random numbers.

38. Having been informed of this fact the Defendants' Synthesis Team replicated the test seeking to validate the models, not just at 10 year-intervals, but at scales ranging from 1 to 25 years.

39. At the larger time scales, Defendants' NAST found the models applicable to global temperatures. But over the U.S., upon which the Assessment focuses, the NAST replicated the test results invalidating the models.

40. In NAST's tests the models actually performed worse than random numbers.

41. The two selected models chosen from the extremes of the available suite of dozens of climate models were therefore proven invalid for their intended use with Defendant's knowledge prior to disseminating the data at issue in this matter.

42. The Hadley Centre for Climate Prediction and Research, which produced one of the two models Defendants employed in the National Assessment, acknowledged at the time that Defendants selected this model that its model's data were not useful for the purpose Defendants are utilizing it.

43. Specifically, Hadley stated this on its website, "in areas where coasts and mountains have significant effect on weather [and this will be true for most parts of the world], scenarios based on global models will fail to capture the regional

detail needed for vulnerability assessments at a national level." http://www.met-office.gov.uk/research/hadleycentre/

44. The National Assessment purports to provide "the potential consequences of climate variability and change", including specific regional impacts.

45. Defendants' USGCRP attest that the conclusions of the National Assessment include the following: "Inundation of Coastal Wetlands in Southeast Gulf Coast *will increase*"; "East/Midwest/Southern temperatures *will rise*, increasing heat indexes dramatically (>10 degrees F)"; "Great Lakes level *likely to decline*, reduced water supply, increasing transportation costs"; "Northwest stream temperatures *will increase*, further stressing migrating fish, complicating restoration efforts"; "Northern and Mountain Regions Recreation industries *will shift*; warm weather opportunities (hiking, etc.) *will expand*; cold weather activities (skiing, etc.) *will reduce*"; "Higher winter temperatures in Mountain West"; "Southeast Atlantic Coast affected by rising sea levels and storm surges"; "Warmer Climate in Great Plains"; "Alaskan winter and spring temperatures to increase" (emphases added).

46. These conclusions are not presented as possible scenarios among several but as the conclusions of the National Assessment on Climate Change, its "Assessment Results: Regional Take-home messages."

47. Defendants' National Assessment findings have served as the express basis for California enacting greenhouse gas suppression legislation, requiring further regulation of automobile emissions in that State.

48. Defendants' National Assessment findings have been employed for other intended policy purposes including incorporation as the United States' "policies and positions" on the science of climate change in a government report submitted to the United Nations pursuant to the UN Framework Convention on Climate Change Articles 4.2 and 12.

49. Defendants' National Assessment has been employed as the basis for litigation by several state attorneys general against the federal government seeking regulation of carbon dioxide as a "pollutant" under the Clean Air Act.

50. Pressure groups also have publicly indicated the intention to use the "admission" of catastrophic anthropogenic climate change that the National Assessment purportedly represents as the basis for litigation under, *inter alia*, the Alien Tort Claims Act and National Environmental Policy Act.

51. Upon inclusion of the National Assessment's findings in the report to the UN, British Prime Minister Tony Blair cited the U.S.'s apparent acknowledgment of catastrophic anthropogenic climate change as why the world continues to expect its compliance with the as-yet-unratified Kyoto Protocol, and otherwise to impose concomitant policy measures including through further international agreements.

52. These actions in reliance upon Defendants' National Assessment demonstrate that it does not purport to be a mere compilation of hypothetical consequences.

53. Using the Freedom of Information Act Plaintiff obtained comments of scientists from national laboratories solicited by Defendants to comment on the draft National Assessment.

54. The warnings and comments identifying the National Assessment's lack of objectivity and utility went unheeded in the final National Assessment currently disseminated by Defendants.

55. As a product of OSTP disseminated by the federal government, the National Assessment or any document purporting to be such product is therefore, barring exemption, a covered document under FDQA.

56. On 31 January 2002 Plaintiff CEI submitted a request to OSTP, pursuant to FDQA and OMB's "government-wide Guidelines", seeking OSTP cease dissemination of the National Assessment because the document violates FDQA's requirements of "objectivity" and "utility".

57. Further, Plaintiff noted that as the statutorily designated steering document for Executive and congressional "climate" policymaking, NACC qualifies as "influential scientific or statistical information" and must meet a "reproducibility" standard, setting forth transparency regarding data and methods of analysis, "as a quality standard above and beyond some peer review quality standards." OMB Government-wide Guidelines (67 FR 370)

58. With Defendant having never responded to this Request, on 20 February 2003, Plaintiff CEI again filed a Request for Correction ("Initial Request"), pursuant to FDQA, OMB's Guidelines and OSTP's own Guidelines for implementing FDQA.

59. On 21 April 2003 OSTP denied CEI's Request for Correction, in a letter from Kathie L. Olsen, Ph.D. This response, Defendant's "Initial Determination," rejected Plaintiff's initial Request on a jurisdictional or procedural argument.

60. Defendant denied Plaintiff's Initial Request on the basis that "the National Assessment [NACC], as a FACA committee document [sic], does not meet the Guidelines' definition of 'information' subject to correction."

61. Defendants did not directly assert any particular authority for this denial.

62. In support of this denial, however, OSTP does incorrectly assert that it "has not adopted the contents of the National Assessment as its own, or otherwise expressly relied upon it."

63. In fact, Defendant OSTP had submitted the Assessment to the President and Congress as the Assessment required pursuant to 15 U.S.C. 2936.

64. To deny Plaintiff's Request OSTP's denial of Plaintiff's Request appears to invoke a provision of its Guidelines exempting from FDQA coverage "information originated by, and attributed to, non-agency sources, provided that OSTP does not expressly rely upon it [such as] non-U.S. government information reported and duly attributed in materials prepared and disseminated by OSTP; hyperlinks on OSTP's web site to information that others disseminate; and reports of advisory committees and international organizations published on agency's [sic] website". OSTP Guidelines V. "Information," (2)(b)

65. By this assertion Defendant OSTP claims that the National Assessment is in fact not OSTP's product at all despite 15 U.S.C. 2936, Reorg. Plan No. 1 of 1977, and Executive Order 12039 assigning responsibility and authority for same to OSTP.

66. Defendants in effect deny that any National Assessment is by definition an OSTP product, and also that it thereby cannot be the product of some third party.

67. As a result of OSTP's claim, Defendants necessarily argue either that they delegated authority and responsibility for producing the National Assessment to another entity (a FACA committee), for which delegation there is no authority in the law, or that the document purporting to be the National Assessment is in fact not, and may not be permissibly described as being, such a product pursuant to the USGCRA of 1990 (15 U.S.C. 2936) (the latter is Plaintiff's Count Three).
68. In fact, neither the statute nor OMB Guidelines exempt or allow for the exemption of information or documents published by a covered office (here, OSTP) on the basis that a it incorporates information produced by other parties, *e.g.*, a committee chartered under the Federal Advisory Committee Act.
69. The National Assessment, which by statute cannot be produced by a third party such as a FACA committee, though it may incorporate FACA committee data, is covered "information" under FDQA.
70. On 5 May 2003, Plaintiff CEI filed a Request for Reconsideration with Defendants appealing OSTP's rejection of Plaintiff's Request.
71. Defendant OSTP asserts in its Guidelines its intention to answer Plaintiff's Appeal in 60 days, a period that expired on 2 July 2003.
72. In the intervening month correspondence by Plaintiff has failed to produce a substantive response by Defendants.
73. Defendants owe Plaintiff a determination on Plaintiffs' Request and Appeal.
74. Defendants owe Plaintiff correction of data failing to satisfy FDQA's standards.
75. By refusing to respond to Plaintiff's Appeal Defendant has thereby constructively rejected it.

76. Defendants acknowledge in their Initial Determination that the USGCRA, Reorganization Plan No. 1 of 1977, and Executive Order 12039 expressly assign authority and responsibility for the National Assessment with OSTP.

77. Defendants thereby acknowledge OSTP responsibility for that any document purporting to be an assessment pursuant to 15 U.S.C. 2936 and submitted as such to the President and Congress.

**Count One – Defendants' "National Assessment" Violates FDQA**

78. Paragraphs 1 through 79 are incorporated herein.

79. Such projections and regional scenarios as Defendant asserts may not credibly be asserted on the basis of computer models due to the state of GCM technology.

80. This is evidenced in part by, *e.g.*, Defendants' two selected models frequently providing outcomes so divergent as to often be at polar opposites.

81. Pursuant to the Federal Data Quality Act covered offices may not disseminate regional GCM climate projections.

82. Pursuant to the Federal Data Quality Act covered offices may not disseminate conclusions claiming certainty or likelihood about future climate derived from GCM projections.

83. Declarations of such potential consequences as Defendants make with such certainty (*e.g.*, "Inundation of Coastal Wetlands in Southeast Gulf Coast *will increase*"; "East/Midwest/Southern temperatures *will rise*, increasing heat indexes dramatically (>10 degrees F)"), and particularly at the regional level, may not be credibly made either under FDQA or as a matter of the scientific method particularly given the state of GCM capabilities.

84. These results are purportedly the product of GCMs, preceded with the statement "Models are used to generate climate change scenarios".

85. Such declarations undercut any subsequent claim for these purposes by Defendants that the projections are mere scenarios among the universe of the possible, but instead manifest that the projections are clearly intend to convey the imprimatur of scientific understanding and certainty.

86. Further, Defendants admit through the USGCRP to making these assertions despite having included in their analyses only two climate "forcings", or factors contributing to climate, Halocarbons and Sulphates.

87. Defendants, however, admit to having identified twelve climate forcings.

88. Defendants admit to excluding ten of these forcings from their analyses.

89. Further, Defendants characterize the level of scientific understanding associated with an included forcing, sulphates, as "low."

90. However, Defendants excluded forcings Stratospheric Ozone and Troposheric Ozone despite characterizing the level of scientific understanding associated with them as "medium".

91. This constitutes a *de facto* admission by Defendants that their analyses do not rise to the level of the best available analysis.

92. This also constitutes a *de facto* admission by Defendants that their analyses do not possess utility in that, having included only one-sixth of the identified forcings, and further with a selectivity inconsistent with respective levels of scientific understanding, they can not be considered to carry the slightest credibility.

93. By this analysis Defendants further testify to the lack of utility of their models and Assessment for the declared purpose.

94. By their actions refusing to respond to Plaintiff and continuing to disseminated demonstrably inaccurate claims, Defendants have unlawfully refused to apply the requirements of the Federal Data Quality Act to the document styled as the National Assessment on Climate Change, produced by Defendants pursuant to the United States Global Change Research Act of 1990.

95. As a matter of law, if the document at issue is in fact an Assessment pursuant to 15 U.S.C. 2936 then it is not a third-party product but a governmental product.

96. Defendants acknowledge that the National Assessment is a product for which OSTP has responsibility pursuant to statute and Executive Order.

97. If the Assessment is indeed OSTP's product, Defendants may not avoid coverage under FDQA by claiming third party authorship of the Assessment.

98. Defendants submitted the document at issue in this matter to Congress and the President as the National Assessment, pursuant to 15 U.S.C. 2936.

99. Additionally, by act of transmitting such document to Congress and the Executive, Defendants did "rely upon" the Assessment that OSTP claims is a third-party product.

100. That action defeats Defendants' rationale for denying FDQA coverage of the product pursuant to OMB's and OSTP's implementing Guidelines.

101. Defendants' proffered interpretation of FDQA that the document prescribed by USGCRA is in fact not Defendants' own product permits an otherwise covered agency to circumvent FDQA's statutory requirements for data

integrity, and even responsibility under another statute (*e.g.*, USGCRA of 1990), by claiming it delegated to a third party authority and responsibility including for products specifically assigned to it by law.

102. FDQA requires data disseminated by covered agencies of the federal government, including Defendant OSTP, meet particular requirements of, *inter alia*, "objectivity" and "utility". OMB Final Guidelines 67 FR 369

103. FDQA also requires that "influential scientific information" must meet the heightened "reproducibility" standard, establishing transparency requirements for data and methods of analysis, "a quality standard above and beyond some peer review quality standards". *Id.*

104. The document prescribed in USGCRA (15 U.S.C. 2936) qualifies as "influential scientific information".

105. The National Assessment produced pursuant to 15 U.S.C. 2936 violates FDQA for reasons including, *inter alia*, that attempts to validate the computer models upon which Defendants' document expressly and largely rely, demonstrated with Defendants' knowledge and in advance of disseminating the document to be less reliable in their ability to project climate than a table of random numbers, violating FDQA's "utility" and "objectivity" requirements.

106. Defendants also violate FDQA's "utility" requirement by inaccurately recreating historical temperature data by impermissibly eliminating large error bars from the data's representation.

107. Such error bars were required as a result of the peer review process for the underlying data, thereby eliminating recognized historical climatic periods.

108. Plaintiff obtained documents through the Freedom of Information Act (FOIA), representing comments of scientists from the national laboratories recruited by Defendants in confidence through the United States Department of Energy, making clear that the Assessment was not peer reviewed and lacks scientific credibility or utility.

109. Typical of the criticisms of the objectivity and utility of the draft National Assessment include characterizing its use of GCMs as "dangerous", describe the Assessment as a "disaster" and "needlessly hyperbolic" and the document's intimation that the threatened impacts are already upon us as a "laughable assertion."

110. Defendants had advance knowledge both directly and through Plaintiffs of such fatal flaws prior to producing the National Assessment, further enforcing that it violates FDQA's "objectivity" requirement.

111. Defendants did not correct the flaws prompting these comments.

112. These same weaknesses set forth in Plaintiff's Initial Request also provide that the National Assessment fails FDQA's applicable requirements for "influential scientific information."

113. Defendants have refused to address Plaintiff's claims on the merits within either the time parameters that Defendants set for themselves, or a reasonable time thereafter.

114. As a result of these actions, Plaintiff has exhausted all administrative remedies.

115. Wherefore, Plaintiff demands judgment against Defendants that the document purporting to represent a "National Assessment on Climate Change" is subject to the requirements of the Federal Data Quality Act.

116. Further, Plaintiff demands judgment against Defendants that the document purporting to represent a "National Assessment on Climate Change" fails to satisfy the requirements of the Federal Data Quality Act and may not be further disseminated by Defendants until corrected.

**Count Two -- Violations of the Administrative Procedure Act**

**a) Defendants Violate the Administrative Procedure Act by Failing to Timely Respond to Appeal Seeking Correction of Information**

117. Paragraphs 1-116 are incorporated herein.

118. Plaintiff is entitled to a response accepting or denying its FDQA Appeal under the applicable statutory standard.

119. By letter dated 21 August 2003 and delivered to Plaintiff by regular mail, Defendant OSTP wrote that due to Plaintiff having sued Defendants for refusing to provide Plaintiff such a determination, Defendant was rethinking whether to execute its duty to provide a determination to Plaintiff.

120. Defendants have wrongfully withheld providing the response owed Plaintiff.

121. Defendants' failure to respond to Plaintiff's Appeal seeking Correction of Information under FDQA constitutes agency action unlawfully withheld and unreasonably delayed, and is arbitrary, capricious, an abuse of discretion, not in

accordance with law and without observance of procedure required by law, all in violation of the Administrative Procedure Act.

**b) Defendants Violate the Administrative Procedure Act by Failing to Correct Demonstrably Impermissible Information Pursuant to its Own Guidelines**

122. Paragraphs 1-121 are incorporated herein.

123. Defendants' rejection of Plaintiff's Request for Correction of Information or Appeal and Defendants' failure to consider the evidence before them demonstrating the inaccuracy of the Assessment's content renders the Assessment as arbitrary and capricious and otherwise in violation of the Administrative Procedure Act.

**Count Three – Defendants' "National Assessment" Violates the United States Global Change Research Act**

124. Paragraphs 1 through 123 are incorporated herein.

125. The statutory authorization for a National Assessment, 15 U.S.C. 2936, makes clear that any document purporting to be such an Assessment is Defendants' product.

126. Defendants style the document "***Climate Change Impacts on the United States: The Potential Consequences of Climate Variability and Change***" or National Assessment as the Assessment prescribed in that USGCRA provision.

127. Defendant OSTP denied Plaintiff CEI's Initial FDQA Request for Correction, and constructively denied Plaintiff's Appeal, on the express basis that OSTP did not in fact prepare the document but that a third party actually produced

it. This attempt to evade FDQA's requirements is not only without merit but it is unlawful.

128. Plaintiff repeatedly notified Defendants in writing that this document does not satisfy the substantive requirements of USGCRA for its failure to address the statutorily enumerated areas required in order to serve as such a document. For example, the Assessment acknowledges its failure to address the required areas of transportation and energy production and use (Foundation document, page 2).

129. Through their rejection of Plaintiff's Request, Defendants now assert the document fails to conform to the statutory requirements for producing a National Assessment by claiming that it was produced by a third party.

130. Defendants therefore acknowledge failing to produce a document satisfying the requirements of a National Assessment as prescribed, implicitly also admitting to submitting, disseminating and otherwise supporting dissemination of their National Assessment with an inaccurate claim that it is a valid Assessment

131. Defendants are therefore unlawfully disseminating their document as the "National Assessment".

132. Plaintiff has exhausted its administrative remedies in this matter.

133. Wherefore, Plaintiff demands judgment against Defendants that the document currently styled as "***Climate Change Impacts on the United States: The Potential Consequences of Climate Variability and Change***", is unlawful and not permissible for any official purposes and may not be disseminated as such.

WHEREFORE, as a result of Defendants' acts and in the absence of this Court requiring Defendants remedy them or declaring any product of such actions unlawful, Plaintiff has sustained and will continue to sustain injury in that Plaintiff is denied its opportunity to obtain relief pursuant to the Federal Data Quality Act and will also be subjected to relying upon impermissible data which also serves as the basis for U.S. government policy and international commitments with direct and indirect professional and financial impacts on Plaintiff. Barring a requirement by this Court that Defendants correct this Assessment or a declaration by this Court that Defendants' evasion of FDQA or claim of third-party production of the Assessment is unlawful, the following will likely result:

• Plaintiff has been and will be denied government climate change information meeting the standards for objectivity, quality, utility and integrity established by the FDQA and its implementing guidelines. Such information is necessary to CEI in its extensive analytical and educational efforts on this issue;

• Plaintiff's education and other information-disseminating activities regarding climate change are being hindered by a government report that does not meet the standards of the FDQA and its implementing regulations. In failing to meet these standards, the report presents a misleading portrayal of climate change and of the state of climate change science. The misleading nature of that portrayal would be remedied by a judicial finding of its invalidity under the FDQA and its implementing regulations.

• Plaintiff will not have the statutorily prescribed opportunity to utilize or work within the context of a lawfully produced product for several years to come, given

that this product took approximately 10 years to emerge and as the first such report will continue to serve as the official government position on the relevant topics if accepted as lawfully produced;

- Plaintiff's education and information-disseminating activities regarding climate change are being hindered by a document which purports to be the Defendants' National Assessment, but which in fact was produced in violation of the statute authorizing it. Given that this document took approximately ten years to develop and is intended, cited and widely viewed as the federal government's official position on this issue, it has a significant and long-lasting impact on both CEI's climate-change activities and on the general debate over this issue. A judicial finding that the report was illegally produced would alleviate both this impact and the report's effect on CEI's activities.
- Such unlawful product and the data at issue in this matter will then serve not only as the formal and purportedly consensus "government science" and policy guidance document, but as the United States' position in international *fora* in which the Executive Branch continues to participate toward negotiating binding treaty obligations on this precise subject matter. These *fora* include the Ninth Conference of the Parties ("COP-9") of the United Nations Framework Convention on Climate Change ("UNFCCC"), negotiations in Milan, Italy, December 2003. The contents of the National Assessment have already been once incorporated in a related May 2002 document submitted to the United Nations and purporting, pursuant to the UNFCCC, to represent "policies" of the United States.

WHEREFORE, Plaintiff demands judgment for:

1. Declarative relief that Defendants' actions described herein are unlawful under the Federal Data Quality Act;

2. Additionally or alternatively, declarative relief that Defendants' actions described herein are unlawful under the U.S. Global Change Act of 1990;

3. Declarative relief that "***Climate Change Impacts on the United States: The Potential Consequences of Climate Variability and Change***", does not satisfy the requirements for a "National Assessment" pursuant to 15 U.S.C. 2936 and therefore may not be formally styled, maintained and/or disseminated as such;

4. Specific declaration of the following actions as unlawful and thus not representing or legitimately serving as or in any formal, official, or legitimate work product:

   A) Defendants publicly maintaining or disseminating the document currently purporting to be the National Assessment on Climate Change;

   B) Defendants publicly maintaining or disseminating, in addressing claims under the Federal Data Quality Act regarding the National Assessment on Climate Change and/or that prescribed pursuant to 15 U.S.C. 2936, that one or the other permissibly delegated authority and/or responsibility for that document to a non-governmental entity;

   C) Defendants publicly maintaining and/or disseminating the National Assessment unless and until the violations of the Federal Advisory Committee Act and Global Change Research Act enumerated herein are remedied to the satisfaction of this or another Court; and

5. Costs of this action and other just relief.

Respectfully submitted,

Christopher C. Horner
D.C. Bar No. 440107

Sam Kazman
D.C. Bar No. 946376
Ben Lieberman
D.C. Bar No. 450393

1001 Connecticut Avenue, N.W.
Suite 1250
Washington, D.C. 20036
202.331.1010

Attorneys for Plaintiff

4 September 2003